Good morning, everyone. Welcome to this 11 a.m. session. We've got one case for submission. Welcome Judge Ana de Alba, who will be appearing by video, and Judge McEwen, and I will be presiding. The one case we have is No. 23927, United States of America v. Sullivan. Mr. Mazur. Who's up first? Okay, Mr. Cariello. Mr. Cariello. Yes. Thank you. May it please the Court. Chris Cariello for Defendant Joe Sullivan. I'd like to reserve five minutes of my time for rebuttal. This case is an unprecedented attempt to hold an individual criminally liable for the way a company handled and reported a cybersecurity incident, and both of the resulting convictions exceed the law's limits. On the obstruction of justice charge, the jury was never informed of two key limitations on Section 1505, the nexus requirement and the duty requirement. These requirements together undermine the entire conviction and require reversal, but at a minimum each of these errors infects one of the government's core theories of guilt and require a new trial. And as for the misprision of felony charge, cases like this are exactly why that's such a maligned offense. The government accused Mr. Sullivan of concealing a crime under the Computer Fraud and Abuse Act, a notoriously unclear statute that had never been applied in these circumstances in history at the time. Neither of these convictions can stand. Your Honor, turning first to the obstruction charge and the nexus requirement, simply put, the jury convicted Mr. Sullivan of obstruction of justice without hearing about an element of the offense. The government now admits that Section 1505 carries a nexus requirement, but claims it's essentially this trivial limit implicit in the other elements. That is wrong, Your Honors. It's a freestanding objective requirement. Maranello, Arthur Anderson, and Aguilar treat it as a freestanding requirement. I'd urge this Court to look at United States v. Lodge. That's this circuit's law adopting the nexus requirement or recognizing the application of the nexus requirement under 1512c. How is the nexus requirement different from the use of the preposition to obstruct the pending proceeding? What does it add? It adds — it adds essentially a proximate cause requirement. It demands this connection, this objective connection between conduct and a proceeding. So I was talking about that — the case United States v. Lodge. In that case, when — when the Court adopts or recognizes the nexus requirement in 1512c, the way that it analyzes it is as requiring one connection to two of proceeding, and that's separate from any intent requirement. If you go all the way back to Aguilar, I think that's very clear in the Court's analysis there. So consider the facts. And now, Aguilar also was not specifically addressing jury instructions, correct? That's true, Your Honor. Aguilar is not discussing jury instructions. Arthur Anderson is. Another case that discusses nexus jury instructions, takes them very seriously, and in fact vacates a conviction, is Quattrone in the Second Circuit, which says 1505 carries a nexus requirement and then spends pages analyzing that requirement and how it needs to be charged to the jury. But I understand. I mean, from looking at the record, and correct me if I'm wrong, you didn't provide a definition of nexus, correct? All we asked for is that the jury be charged on their — the requirement of a nexus between conduct and the proceeding. So the answer is, no, you didn't. We didn't define the word nexus. You said you wanted the word nexus in there. That's correct, Your Honor. That's what you wanted. That's all we asked for. But that is a requirement. And again, I think the jury would gather from that exactly what United States v. Lonitch defined that the element — the freestanding element as, a connection to a proceeding. Back to Aguilar. But again, the instruction already says a connection to a proceeding. For the intent requirement, for the — there needs to be a corrupt — a corrupt intent to affect a proceeding. But under Aguilar, that is a separate requirement from the nexus requirement. So the example Aguilar gives is — is really illuminating here. The example of two spouses, and the — the husband has committed a crime, knows there is a pending investigation of that crime, and tells his wife a lie about where he was because he's thinking, well, in that pending investigation, they will The intent of the husband in that hypothetical is to affect the proceeding. That is exactly the purpose of telling his — his wife that. But what the Court says is that conduct is too equivocal. It doesn't have that connection of — of natural and probable effect. And the key words there in Aguilar are might or might not. Those are the — the key causal words. And when you apply that — that standard to this case, the conduct that the government charged Mr. Sullivan with, so much of it took place while he's responding with his team to the 2016 security incident. So that's an ancillary context, far more ancillary than the FBI interview in Aguilar. And then all of the conduct, is it conceivable that maybe the cookie would crumble in a certain way, that it prevents the FTC from learning about something? Perhaps it's conceivable, but it might not, because it depends on so many factors. And that attenuated chain of ifs, the fact that 30 people are aware of this incident, the CEO is aware of the incident, and none of them, none of them testified that they were told to lie to the FTC or to conceal anything from the FTC. Well, on the jury instruction point, it seems to me that, you know, you get the standard instruction, and then you also have this Fugat case, which seems to be on all fours with the situation here. And you didn't need to have the word nexus in there to comply with Ninth Circuit law. So we're bound by Bagot or Fugat. And if you agree with that, where do we go, how do we adopt your position? Your Honor, we fully acknowledge that Fugat forecloses our position. We're asking this panel to essentially overrule circuit precedent. Right, and you know we can't do that. So it's probably more productive to move on. And I appreciate that. Understood, Your Honor. Your candor. Understood, Your Honor. And we do think the Court can do it because of Marinello, Arthur Anderson, and the Aguilar line of cases. But I fully acknowledge that this is a really high bar to overrule circuit precedent. I would just note as I move on to my next point how consequential the nexus requirement is on the facts of this case. A reasonable jury absolutely could have rejected the government's theory with a properly instructed nexus requirement. And there's bad law on the books that really ought to be examined at some stage of these proceedings. But moving on to our second round for...  Yes. Counsel, I'm sorry. This is Judge D'Alba. I know I'm on video so it's a little bit more difficult. I just need some clarification. Am I correct that Sullivan never informed Uber's General Counsel about the breach? Yes, there was testimony in the record that Mr. Sullivan never affirmatively informed the General Counsel. I would hasten to add there is no dispute that Mr. Sullivan informed the CEO of the company. And Sal Yu, who was the General Counsel, testified. It was the prerogative and the CEO was in position to inform the General Counsel. Okay. And now I just need some clarification on how that bug bounty program works. So do you get to, you meaning your client, or Uber, get to decide, hey, the bug bounty program is working right now. So if anybody finds a really juicy issue with our computing system, we'll just use that to kind of not have to tell the FTC. Or is it, hey, the bug bounty program is working right now. You have a month, hackers, to find something and let us know about it. The way the bug bounty system works is it's a sort of blanket invitation. So at 1784, Rob Fletcher, who was on Mr. Sullivan's team, explains this. It's essentially an open invitation to, quote, anybody on the internet. And then the policy says to report any vulnerability that could affect Uber's users. So it's an open invitation and it sets certain conditions. And what happened here, Uber had always understood, Rob Fletcher testified to this, Colin Green testified to this. The guidelines are flexible. It's Uber's system. It's Uber's program. And Uber is making decisions about what's in its interest and trying to align those interests with researchers in the real world who are discovering vulnerabilities. So that's essentially how the bug bounty program operated. But Mr. Cariello, it seemed like the hackers did more than accept Uber's invitation. When you speak of it as an invitation, there are terms on the invitation. They didn't accept the invitation. They did something different. And I guess my concern is, how are we supposed to distinguish this post-hack ratification theory from the cover-up that the government charged? Your Honor, the answer is you don't need to do that. Because all that's at issue here in this appeal is what Mr. Sullivan understood to be the reality, what Mr. Sullivan understood to be the case. So in this instance, they had a situation and they wanted to use their bug bounty program. There's no dispute that Uber wanted to use the bug bounty program. And this is a sufficiency of evidence challenge on this. It is. But it's a high bar. Because if we're talking about — I think we're talking — we've moved on to misprision of felony. Right. And when we're talking about the misprision challenge, what Chambrone has said, what Olson has said, is that it needs to be clear-cut. It needs to be full knowledge of criminal conduct. So there needs to be clear-cut knowledge of Mr. Sullivan's understanding. And so on this record, there's certainly not that level of understanding, because you have several markers about what Uber understood to be its prerogative to authorize the researcher's conduct here. And these are undisputed facts in the record. First, Craig Clark, Uber in-house counsel, who's responsible for cybersecurity — it's his job to evaluate the company's legal obligations with respect to cybersecurity — testifies that his view was that once you do a bug bounty agreement, for all intents and purposes, the access is authorized. That's the person in charge of advising the security team, testifies to precisely that understanding. Second, 11 witnesses at trial were there at the time and were on the security team. The government could have asked every single one of them, do you disagree with Mr. Clark? Do you disagree with that legal advice that the security team was operating under? Did you think after the bug bounty, Glover and Muiracre were unauthorized? Asked none of them, and not a single person who was there testified in this record, after the bug bounty, we thought that they were still unauthorized. No one. And third, Your Honors, in history, at the time, no one ever had been prosecuted after a bug bounty agreement because — because presumably the understanding, at least the understanding on the security team was, you're authorized after that. So there's nothing in the real world where people are constantly getting in trouble after a bug bounty agreement. It had never happened. Right. But this is — it seems to me that before the access, they didn't really qualify for this bug bounty program. And there's — there is this, what I want to say, retroactive pasting over. So that is what's troubling here. Your Honor, I understand. Then this goes to Judge Johnstone's question, I think, too, about the access initially going outside of the conditions. That is absolutely correct. These — Glover and Muiracre were outside of the conditions when they did this. They hadn't properly accepted the bug bounty conditions. However, this record is unmistakable. At 1788, 98, and 99, Rob Fletcher testifies the guidelines are flexible, testifies if somebody violates the guidelines, it would not be out of the ordinary for Uber to modify those guidelines and treat it as a bug bounty. The — Colin Green, 3053 of the record. The rules exist in service of the bug bounty program. Uber could treat it as a bug bounty if it wanted to. I hasten to add, when we're — when we're talking about Mr. Sullivan's understanding of the situation, his knowledge, the question is not whether they are correct. The question is whether they reasonably believed that. And the record is unmistakable that the security team reasonably believed that it was Uber's prerogative to modify its own guidelines and use a bug bounty. And once they've done so, the only question after that is what's the effect? And — Roberts, I guess, what — what do you say to the — the — I believe the government makes the argument that 1030 has a time component, that the concern is, when the hack occurs, is it authorized, and that a policy that would provide flexibility and later ratification of hacks basically guts the purpose of the statute? Your Honor, a few points there. First of all, nothing on the text of the statute carries this time component. In fact, I'd urge your court to — the court to look at subparagraph 1 of 1030, right above subparagraph 2 that we're talking about. That subparagraph says anyone having access to a computer without authorization and doing something. That's what the government is getting at. Congress made a different choice in subparagraph 2. It doesn't have that clear temporal limitation. But thereby — thereby obtains. There's no doubt, although there is — this is part of the information that was suppressed, that the hackers obtained data from the hack initially. That's correct, Your Honor. So why doesn't thereby do that work, intentionally accesses a computer without authorization and thereby obtains? So, Your Honor, I don't want to — I don't want to push the point too far, because that question is not what's before this court. What's before this court is whether it could reasonably be read — be read the way Craig Clark, who was Uber in-house counsel in charge of this, read it, the way that 11 people it did not contradict, that it could be read to permit post-access authorization. We think the better reading of the statute means authorization is unlimited, but that's not the question here. The question is just whether that's a reasonable reading of the statute. Your Honor mentioned before the government's policy — But isn't it a question of whether — well, okay. So — but that's situated within the rational juror standard for a sufficiency challenge. The question is whether a reasonable juror could find that Mr. Sullivan had a clear-cut understanding that he was concealing criminality. And in a — in a world where no one in history had ever been prosecuted for this, where the in-house counsel assigned to Mr. Sullivan's team is of the view that it wasn't criminal conduct after the bug bounty and not a single person testified otherwise that that was their view, you can't have that kind of certainty that Mr. Sullivan believed that. In fact, the opposite inference is far more powerful on this record. The government tries to read — That — that seems to me to be the jury argument. And now we're post-conviction. And so that is the hill that you have to climb. Your Honor, I — Your Honor, I understand — I understand. I think the three factors that I've been emphasizing create unmistakable doubt. We cited the Martinez case for the proposition that when you have undisputed evidence that creates doubt, the government needs something that's more than weak and ambiguous. And weak and ambiguous is all they have here. But I take — I do take Your Honor's point, and — and I will move on to — to the new trial ground —  — with Your Honor's indulgence, which I'd like to spend just one minute on before I sit down. Okay. I don't think we've — we allowed you to get to the duty to disclose, so we'd appreciate — we talked about — I think we took you over to the knowledge point before you were finished with that.  So — so I can turn back to omissions now first before doing the plea, if that's helpful. So the second ground on which this Court can and should order, at a minimum, a new trial is that the — the — the Court failed to instruct on a duty to disclose. And I think the first, most important question before this Court, as it comes to this Court upon the briefing, is did the government submit an inaction-based theory, a freestanding inaction-based theory that would necessitate this duty instruction? It absolutely did. E.R. 3374, the government says to the jury, the critical passage, the question, quote, presented to you is, quote, did the defendant do anything or, disjunctive, intentionally fail to do something because he didn't want the FTC to find out? That is the government saying at 3374. They say again at 3438, jury, if you reject our affirmative conduct theory, you can also convict based on inaction. That's why we asked for this instruction. And United States v. Shields stands for the proposition that where the government submits that kind of inaction-based theory and where there is a risk that a jury, a lay jury, won't understand this legal concept of the difference between a kind of criminal omission and bare inaction, it's error to not give the instruction. And that's why we asked for the instruction. Kagan. But what about conviction under 2B, Section 2B? Section 2B is what the government has argued is sort of the panacea for this omissions-based theory. To begin with, it would be quite extraordinary if what the government is saying about Section 2B were true, that there literally needs to be no duty at all of the defendant, can be a pure bystander and not say something, and as long as the bystander has a guilty mind and could have stopped someone else from committing a crime, then that individual is guilty. And that's the best support for the fact that somehow 2B requires this duty to disclose. So I think the best support for that is the backdrop principle that we cited several times, that criminal conduct inherently requires either action or an omission-absent duty. But, Your Honor, I think there's an easier answer to the Section 2B theory and an easier reason that the jury could have and, in fact, we think would have had to reject it. And that's United States v. Singh. The fact pattern in United States v. Singh is you have the defendant, a political campaign, and the Federal Election Commission. And the theory there is a bit similar to this one. It's because the defendant didn't tell the political campaign something, the political campaign didn't tell the Federal Elections Commission. In the one instance in United States v. Singh where the defendant said to the political campaign, and this is all the defendant said, it's been taken care of, of the source of the funding, this is this Court reversed the conviction on sufficiency grounds. It's been taken care of. In this record, the evidence that Mr. Sullivan informed Uber, informed the chief executive officer of Uber of the fact of the 2016 incident is overwhelming. At ER-514, at the outset of the matter, Mr. Sullivan sends Mr. Kalanick an e-mail and says, this is going on. ER-515, I'd urge this Court to look at that page of the record. Mr. Kalanick is not only aware of the situation, is managing the situation. This is the CEO of the company is aware. And then at ER-539, the bookend, when the bug bounty agreement is signed, Mr. Sullivan sends it to his boss, the chief executive officer. That is so much more than the taken care of that required reversal in United States v. Singh. And so at an absolute minimum, a reasonable jury that is charged with either the nexus instruction or charged with a duty to disclose instruction could have come out a different way. This is a harmless error standard. The government would have to show a harmless error beyond a reasonable doubt. And the Section 2B theory is nowhere near ironclad enough to supply that beyond a reasonable doubt. Mr. Cariello, do you want to reserve your remaining time? I will do so. Thank you. Okay. Thank you. Now, Mr. Mazur. Good morning, Your Honor, and may it please the Court. My name is Ross Mazur, and I represent the United States. It's undisputed that this case presents a flagrant example of obstruction of justice, and there is no merit to the defendant's argument that he wasn't the one responsible. Let me start with the nexus argument. The nexus argument fails for two independent reasons, first, because the defense position is foreclosed by this Court's decision in Begat, and second, because any error in not instructing on nexus would have been harmless. Now, as to the foreclosure argument, you know, the — I think he's acknowledged that. It is — right. And — I don't know that you need to spend your time on it. I thought he was very candid about that. It is. I would only add that to the extent there's any plausible appeal to the argument  You're not getting the suggestion, apparently. It was — it would have been put to rest by Fisher. Let me move on. So with the Court's indulgence, I'll turn to the duty-to-disclose argument. And the text of 1505 and of 1515b, which defines the term corruptly for purposes of 1505, defeats the defendant's So 1505 requires an endeavor to obstruct justice, the term endeavor connoting act of conduct. And then 1515 defines the term corruptly to mean acting with an improper purpose, such as by withholding or concealing information. So this is the unusual statute where Congress has actually enumerated actions that satisfy the obstruction provision. So by its nature, 1505 only applies to affirmative conduct. Congress has made that decision. Now, the defense does argue that, you know, if that were the correct interpretation of 1505, then the statute would effectively be boundless. But that's just not true. You know, an employee, for example, would have to know the information being sought by the proceeding, would have to know its significance, would have to know that it's being withheld, would have to share in the company's or the executive's specific intent to obstruct the agency proceeding. And so it's — especially given the very high level of mens rea, it's just not true that the government's reading of 1505 — Counsel, let's just judge them. I don't know if you can hear me. I apologize. I know with the video it's a little bit difficult. Can you tell me specifically what the government — what specific omissions the government thinks amounted to concealment? I'm sorry, Your Honor. Would you say that one more time? Absolutely. What are the specific omissions on behalf of Sullivan, omissions that Sullivan did that you think amount to concealment? Well, I would resist the characterization that any of this is omissions. Like I said, I think 1505 and 1515 squarely define withholding and concealing information as affirmative acts of obstruction. But there was overwhelming evidence that the defendant, you know, for over 10 months falsified documents, authorized hush money, engineered a series of affirmative misstatements to the FTC. He lied during internal investigations, and 10 days after he gave sworn testimony before the FTC, he learned that many of the representations he had made were false, including representations about the remedial measures Uber had taken to fix the problems that led to the 2014 data breach, the same data breach that occasioned the FTC investigation in the first place. And over the course of the next 10 months, the defendant did everything to silo information. He never informed the lawyers at the company who were responsible for handling the FTC investigation that there had been an unprecedented data breach. He never told the A-team that's at ER-2449. He never told the general counsel, to whom he reported in his role as deputy general counsel, that's at ER-2399-2402. He never told Pham, that's the chief technology officer, that's at ER-2615-17. He never told Candace Kelly, one of the in-house lawyers responsible for the FTC investigation, that's at ER-2688. He never told Sabrina Ross, another in-house lawyer responsible for the investigation, that's at ER-1904-1909. And I could go on and on. Now, the defendant... I'm sorry. I'm sorry. I have a follow-up question then, because you mentioned he authorized hush money. Your friend on the other side talks about that as being just a payment for a bug bounty, which is a perfectly legal thing for Uber to do to try to get... You call them hackers, they call them investigators, but to get folks to be able to do work for them and be able to figure out if there's issues with their computer systems. And at what point does it stop being bug bounty and start being unauthorized hush money? I think that presents some interesting issues, Judge DiAlba. But none of the... There may well be difficult line-drawing questions about where bug bounty ends and where 1030 might begin, but none of those issues are even close to being presented in this case. Now, as defense counsel emphasized, it's true that the bug bounty program that Uber advertised to the public was flexible, but that flexibility came in at the front end. If you look at the terms of the program itself, it was written in a flexible way. We don't have to get to retroactive authorization, but the program did have a few limitations, a few categorical rules. And maybe the most striking was that the policy excluded using an AWS access key to download data. And there is no question that that is precisely what Mariachri and Glover, the two hackers, did in this case. They violated one of the few cardinal non-flexible rules in Uber's bug bounty program. And so the fact that the program may be flexible within certain limits does not change the fact that this was not a bug bounty. And what's more is nobody at Uber, even the defendant, really thought this was a bug bounty. In order to use a bug bounty as a charade for covering up what happened here, the defendant had to reinvent Uber's entire policy, change it from a public bug bounty program to a private one, increase the maximum payment from $10,000 to $100,000, get rid of insisting on a payee's tax information and just pay out the $100,000, and then have Uber investigators for the next several weeks track down the hackers because they hadn't identified them yet in order to get them to sign a new NDA which still contained false terms about what they had done. None of that resembles a bug bounty. Now, you know, in response to your question, Judge D'Alba, the government firmly believes that bug bounty programs are important. They're a useful tool to the tech community. And we think that by affirming the judgment in this case, you can actually uphold the integrity of actual bug bounties, which is not what happened here. Now, the defense relies very heavily on testimony by Craig Clark. This is on page 2109 of the excerpts of record, that if something is a bug bounty, then it's not a reportable crime. I would urge the court to look at exactly that page and to look at Clark's testimony. What he said was that if — first of all, he was talking about state notification laws, not the FTC. And he acknowledged in a separate piece of testimony that he had no idea what the definition of a bug bounty for the FTC. He just didn't know. And that's at ER 2114-15. What he said also is that if there is an actual data breach — sorry, an actual bug bounty, it's not reportable. He did not say that if something happens that Uber characterizes as a bug bounty, it's not reportable. But only if something actually falls within the bug bounty definition, it wouldn't be reportable by definition under state notification laws, not the FTC. Which he had no idea about. The defense has mischaracterized Clark's testimony. I want to go back on this duty to disclose. You argue it seems in the alternative we could just go to Section 2B. Would you elaborate on that argument? Yeah. Under 2B, the defendant can be liable for causing an act that would have been a crime if the actor had the requisite intent. And even if the defendant didn't personally submit false statements to the FTC, he certainly caused others at Uber to submit those statements. And as an alternative argument to our, you know, primary argument that the text, the 1505 and 1515, foreclosed the defendant's argument, the Court could also affirm under — under 2B. There's no — there's no — the defense certainly hasn't cited anything to show that 2B would require a duty to disclose. It's also true that the Court should reject the duty to disclose argument because any error would have been harmless. For one thing, the defendant had a duty to disclose. He was uniquely situated to understand what happened here. He was the chief security officer and deputy general counsel at Uber. He was responsible for responding to the — to the hack and to the FTC investigation. Uber designated him as the sole person to sit before a sworn FTC deposition at which he was deposed for six hours. Uber listed him on the responses to FTC interrogatories as the person who supervised the preparation of those interrogatories, and that is at ER 548. Candace Kelly, Sabrina Ross, consulted with the defendant on responses to — to every interrogatory. I'll give you a few citations. That's ER 1872, where Kelly refers to the defendant as her chief client in responding to the FTC investigation, or ER 1259. And essentially, the defendant sat in meeting after meeting where this was discussed. He signed off, authorized one submission to the FTC after another, and omitted the most crucial fact bearing on the FTC investigation, which was that 10 days after he gave sworn testimony, Uber experienced the largest data breach in company history. That data breach occurred in a manner almost identical to the breach in 2014, the breach that occasioned the FTC investigation in the first place. The data breach involved the — the personal information of over 50 million Uber users, and over the course of 10 months, the defendant, who almost — who was almost the only person at Uber to have a monopoly on information about both the breach and the FTC investigation, never informed the FTC. Now, the defense argues that, you know, 30 other people at Uber were aware of what happened, and in particular, the CEO was aware. I don't know where they got those numbers. It is true that in the — that in the — the hours immediately following Uber learning, you know, of a potential security incident, the security team informed some of the executives at Uber that there was a potential incident. That's true. And I think that's where the 30 number comes from. But within a day or two of the — of the breach, which is to say immediately after Sullivan learned that — of the scope of the breach and that data was downloaded, all of — all of those people who had been initially notified that maybe something had happened were told that, you know, it was swept under the rug. We're told that this was a routine bug bounty, and they didn't need to worry about it anymore. A great example is — I don't know how to pronounce her name — Bertuca, the head of communications. She tells this story at ER 2769 to 73. And as we say in our brief, you know, most people, even those in the security group responsible for responding to the hack, were only peripherally aware of the FTC investigation. And I'll point you to the citations on pages 12 to 13 of the government's brief. Unless the court has any further questions, the government would ask you to affirm the judgment. Any other questions? No. Thank you, Mr. Mazur. Thank you. Mr. Cariola, we'll give you two minutes. Thank you, Your Honor, so I'll try to hit as much as I can in that brief period. First of all, on the omissions point, the government says they're not relying on  Six times Mr. Mazur stood here and said, never told, never told, never told, never told, never told, never told. At ER 3374, that's absolutely what they asked the jury to do. Now we're here and the government is saying, oh, well, it's harmless anyway. And they have all these arguments about Mr. Sullivan apparently owing a duty to the FTC. You will not find that in their answering brief. And in all events, as United States v. Shield says, if the government is going to argue there's a duty, that is at a minimum a jury question. A properly instructed jury should have heard about the duty to disclose, should have received that instruction. And under United States v. Yates, because that infects at least one of the government's theories, a new trial is required at a minimum. On the misprision count, first of all, the government has all of these arguments about how this isn't a real bug bounty. There is no bug bounty purity test. And everything the government said was just the government saying it. There were no citations to someone who said, here's the cardinal unbreakable rule. That's just the government saying that. There is no evidence that Uber could not modify, that there are some guidelines that are inviolable. They're Uber's guidelines. And Uber is the one that gets to decide whether it's going to modify them. The government also points out that Craig Clark, when he says after a bug bounty, the conduct is authorized, that that was a state law comment. Authorized means authorized. And it has the same effect under federal law as it would have under state law. Finally, your Honor. I did want to ask really quickly. I'm sorry. I did want to ask on that AWS key, where originally the bug bounty said you can't use information found that way. You're telling me it's okay for them to modify it after the fact? I mean, that does smell like a cover-up. What I am saying is that it is Uber's bug bounty program. And it is within Uber's prerogative to authorize it after the fact. They understood it that way. And that's why Mr. Sullivan did not have criminal intent. Your Honor might believe, or the jury, or the government might believe, this wasn't a great time to use a bug bounty program. But Uber understood itself to be doing that. And Uber understood once it has done a bug bounty program, that authorizes the conduct. And that means Mr. Sullivan did not act criminally under the misprision of felony statute. Your Honor, if I may just for one minute address the plea issue, which I haven't been able to get to. Sure. Even if your Honors disagree on the sufficiency point on the misprision of felony charge, there was a plea agreement admitted in this case that was essentially the way the government tried to fill in the zero on the fact that no one had ever been prosecuted under these circumstances under the bug bounty agreement. They wanted the jury to look at this plea agreement and say there is a definitive judicial record that says that even after the bug bounty agreement, this is felonious conduct. The problem and why it was so prejudicial is that was never litigated in Muir Acres' case. There was no incentive to do it. Mr. Sullivan had no opportunity to challenge it there. And so it came in here as evidence that Mr. Sullivan was aware of a felony, but it wasn't actually solid evidence of that to begin with. It wasn't probative for anything beyond what the government already had in the record. And because it was so prejudicial as compared to that minimal probative value, it should have been excluded, and it independently merits a new trial. Your Honor, we respectfully request that this Court reverse both of these convictions in this prosecution. What the least Mr. Sullivan deserves is a fair trial in an unprecedented case. He deserves a case where the jury hears about the legal constraints on the government's theories, and he deserves a case where he's tried, based on evidence offered against him, that he has the opportunity to contest and not someone else's untested plea agreement. So at a minimum, we respectfully request that this Court vacate and order a new and fair trial. Thank you, Your Honors. Thank you, Mr. Cariello. Thanks to counsel for your arguments. And with that, we are in recess for the day.
judges: McKEOWN, JOHNSTONE, ALBA